| | | |
|---|---|---|
| JOSEPH C. BOOKER (B75795), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 10 C 3995 |
| | ) | |
| | ) | |
| MARCUS HARDY, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Petitioner Joseph C. Booker, a prisoner at the Hill Correctional Center, brings this *pro se* habeas corpus action under 28 U.S.C. § 2254 challenging his 2003 murder conviction from the Circuit Court of Cook County. The Court denies the petition on the merits, and declines to issue a certificate of appealability.

## I. Background

The Court draws the following factual history from the state court record (Dkt. 28.) and state appellate court opinions. State court factual findings, including facts set forth in state court opinions, have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1); *Tharpe v. Sellers*, 138 S. Ct. 545, 546 (2018); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citations omitted). Petitioner has not made such as showing.

Following a jury trial, Petitioner was convicted of the fatal shooting of Charles Rails at the Wentworth Gardens housing project on the evening of September 8, 2002. *Illinois v. Booker*, No. 1-03-3533 (Ill. App. Ct. 2005) (Dkt. 28-1, pg. 1.). Wentworth Gardens is a quarter mile south of Comiskey Park (now known as Guaranteed Rate Field), the home of the Chicago White Sox. Three eyewitnesses, Kenneth Williams, Darnell Brown, and Louis Dean, all testified at trial that Petitioner was the killer. *Id*. at 1-4.

Williams knew Petitioner from the neighborhood because Petitioner frequently visited a friend who lived at the housing complex. *Id*. at 1. The victim was Williams's longtime friend. *Id*. at 2. Williams explained that Petitioner and the victim got into an argument over "gang banging stuff," sometime between 9:30 and 10 p.m. on the night of the murder. *Id*. at 1-2. Petitioner and the victim had a second argument at 10:30 p.m. *Id*. at 2. At this point, Petitioner got into his car and drove away. *Id*.

A few minutes later, Williams saw Petitioner running down the street toward the victim while holding a gun in his hand. *Id*. Williams fled in response but saw Petitioner point the gun at the victim and shoot. *Id*. Williams then looked back to see if Petitioner was chasing him. *Id*. While looking back, Williams saw Petitioner standing over the victim and he heard more gunshots. *Id*. Williams said the area was

well lit at the time of the shooting. *Id*. He also identified Petitioner in a lineup two days after the killings. *Id*.

A private detective hired by the defense determined that Williams was 35 feet from the shooting location when he witnessed the killing. *Id*. at 4. The detective stated a large tree with a circumference of 29 feet was between Williams's location and the killing. *Id*. Williams repeatedly denied on cross-examination that the tree obscured his ability to observe the shooting. *Id*. at 2. Williams also admitted on cross-examination that he drank two beers earlier that evening, but denied being drunk. *Id*.

The second eyewitness, Brown, testified that he was walking with the victim shortly before the shooting. *Id*. He stopped to speak to a friend while the victim continued walking towards Williams, who was sitting on a set of outdoor steps. *Id*. Brown, who was then walking towards his home, heard a gunshot followed by four more shots. *Id*. at 3. He ducked behind a car when he heard the second set of shots. *Id*. He looked up to see Petitioner standing over the victim holding a gun that he placed on the right side of his body by his hip. *Id*. Petitioner then got into his car, which Brown had seen him driving on previous occasions. *Id*. Brown was four to five car lengths from Petitioner and the victim when he witnessed these events. *Id*. He also said the area was well lit. *Id*. Brown identified Petitioner at a lineup a few days after the shooting. *Id*.

On cross examination, Brown stated the shooter's body was turned sideways when he stood over the victim preventing him from seeing the shooter's face. *Id.* He also conceded that he picked Petitioner out of the lineup based on what he was wearing and his build. *Id.* However, on redirect, Brown clarified that he picked Petitioner out of the lineup because he saw Petitioner shoot the victim. *Id.*

The final witness was Louis Dean, a 13-year-old, living in Wentworth Gardens. *Id.* He was in his bedroom watching television at 11:30 p.m. on the evening of the shooting. *Id.* At some point, he looked out the window and saw the victim, who was his friend from the neighborhood. *Id.* Dean explained that he saw Petitioner walk up behind the victim and shoot him. *Id.* at 3-4. After the victim fell to the ground, Dean saw Petitioner standing over the victim firing additional shots. *Id.* at 4.

Dean admitted on cross examination that he signed a statement given to a police detective and an assistant state's attorney two days after the shooting stating that he heard the gunshots but did not see the shooting. *Id.* He also stated that he did not remember telling the grand jury that he did not know where the gunshots came from. *Id.* However, Dean clarified at trial that his previous statement to the police and prosecutor was incorrect, and that he was telling the truth when he testified at trial that he witnessed Petitioner shoot the victim. *Id.*

The police recovered five cartridge cases and four metal fragments from the murder scene. *Illinois v. Booker*, 2017 IL App (1st) 130177-U, ¶ 9. The murder weapon was not recovered. *Id*.

The jury found Petitioner guilty at the completion of trial. Dkt. 28-1, pg. 6. The Appellate Court affirmed Petitioner's conviction. *Id*. at 13. The Supreme Court of Illinois denied his petition for leave to appeal (PLA) completing his direct appeal. *Illinois v. Booker*, 217 Ill.2d 607 (2006) (Table).

Petitioner then brought a postconviction petition in the state court that was denied. *Booker*, 2017 IL App (1st) 130177-U, ¶ 2. The state appellate court affirmed the denial, *id*. at ¶ 3, and the Supreme Court of Illinois denied his postconviction PLA. *Illinois v. Booker*, 419 Ill. Dec. 781 (2018) (Table).

Petitioner filed his original federal habeas corpus petition in 2010 when his postconviction proceedings were then pending before the state trial court. Dkt. 1. The late Honorable Blanche M. Manning, who was then assigned to this case, stayed the case pending the completion of Petitioner's postconviction proceedings. Dkt. 11. Petitioner returned to this Court and filed an amended petition following the completion of his state court proceedings. Dkt. 19, pg. 3. The matter was reassigned to this Court by the Executive Committee. Dkt. 20. The parties have briefed the petition, Dkt. 27, 32, making it ready for the Court's resolution.[1]

_____

[1] The Court's December 4, 2018 minute order granted Petitioner's motion for judicial review.

## II.    Analysis

The amended petition raises the following claims: (1) the trial court erred by giving a supplemental jury instruction after learning of the numerical division of jurors regarding the verdict during deliberations; (2) ineffective assistance of trial counsel for failing to: (a) challenge Petitioner's arrest, (b) challenge lineup identification, (c) investigate and secure the attendance of Monica Ramsey at trial; (d) challenge Melissa Westmoreland as a rebuttal witness to Kenneth Williams's testimony, and, (e) investigate potential eyewitnesses Belinda Brown and Antione Ford; (3) ineffective assistance of appellate counsel for failing to raise Petitioner's sufficiency of the evidence claim in his petition for leave to appeal before the Supreme Court of Illinois on direct appeal; (4) a cumulative error claim predicated upon the sum total of trial and appellate counsel's alleged ineffectiveness; (5) a challenge to the sufficiency of the evidence supporting Petitioner's conviction; (6) the knowing use of perjured testimony by the prosecution; and (7) fabrication of evidence by the Chicago Police Department. We address the claims in turn.

---

Dkt. 26.   The Court granted the motion solely to the extent of allowing Petitioner to proceed with the arguments along with those in the amended habeas corpus petition.   *Id*.

### A.     Claim One: Jury Instruction Claim

Petitioner argues that the trial judge coerced the jury into rendering a guilty verdict through the use of a supplemental jury instruction after the jury had informed the trial court three hours earlier that it seemed deadlocked.

Following the close of evidence, the jury began deliberating at 3:30 p.m, and later returned a guilty verdict around midnight that evening.    Dkt. 28-1, pg. 4, 6.    At 6:30 p.m., the jurors sent a note to the judge stating, "we seem to be deadlocked, 9 guilty 3 not guilty, no one wants to change their vote we need direction."    *Id*. at 4-5.    The trial court instructed the jury to continue deliberating.    *Id*. at 5.

At 7:30 p.m., the trial court granted the jury's request to review the transcript of Brown's testimony.    At 9:00 p.m., the jury wrote another letter to the judge stating that they could not reach a verdict.    *Id*.    This time, the trial judge, over defense's objection, gave the jury the following *Prim* instruction:[2]

> Members of the jury, the verdict must represent the considered judgment of each juror.    In order to return a verdict, it is necessary that each juror agree there to.    Your verdict must be unanimous.    It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourselves, but do so only after an impartial consideration of the evidence with your fellow jurors.    In the course of your deliberations do not hesitate to reexamine your own views and to change your opinions if you are convinced that it is erroneous, but do not surrender your honest convictions as to the witnesses or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.    You are not partisans, you are

---

[2] The instruction in this case comes from *Illinois v. Prim*, 53 Ill. 2d 62 (1972).

judges, judges of the facts.   Your sole interest is to ascertain the truth of the evidence in this case.   Your continued effort is appreciated.

*Id*. at 5–6.   The trial judge then instructed the jury to continue its deliberations.   *Id*. at 6.   At 10:05 p.m., the trial judge granted the jury's request, over defense's objection, to review a transcript of Williams's testimony.   *Id*.   The jury then returned its guilty verdict at approximately midnight.   *Id*.

Petitioner raised this issue on direct appeal.   The state appellate court, the last state court to address the issue on the merits, rejected the claim concluding that the trial court's use of the *Prim* instruction was non-coercive.   *Id*. at 12.   He also raised the issue in his direct appeal PLA completing the exhaustion of the claim, and the state supreme court denied the PLA.   Dkt. 28-2, pg. 3.   Petitioner now renews the issue before this Court.

Petitioner's claim is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).   The Court's review is of the state appellate court opinion on direct appeal because that was the last state court to resolve the claim on the merits.   *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Green v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006)).

Under the AEDPA, the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United

States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). "The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

The Supreme Court has addressed this area of law through two distinct types of cases: (1) constitutional, and (2) supervisory via its authority over lower federal courts. The Court is limited to the Supreme Court's constitutional decisions because the Supreme Court made clear that its supervisory authority rulings do not implicate the constitution, and so do not qualify as "clearly established federal law" applicable to habeas corpus proceedings under 28 U.S.C. § 2254(d)(1) of the AEDPA. *Early v. Packer*, 537 U.S. 3, 10 (2002) (per curiam) ("nonconstitutional decisions are off the table as far as [Section] 2254(d) is concerned . . . .").

The Supreme Court's constitutional holdings instruct that a criminal defendant tried before a jury has a right to an "uncoerced verdict from that body." *Lowenfield v. Philps*, 484 U.S. 231, 241 (1988). A trial court may give a supplemental instruction as long as it is not coercive to the jury. *Id.* at 237. When, as here, a prisoner argues that a supplemental jury instruction resulted in unconstitutional coercion, the Court's review

is of the "supplemental charge given by the trial court in its context and under all circumstances." *Id.* at 237 (internal quotations and citations omitted).

The clearly established federal law in this area is "sparse" and "provides very little specific guidance." *Wong v. Smith*, 131 S. Ct. 10, 11 (2010) (Alito, J., dissenting from denial of certiorari). *Lowenfield*, is the only case from the Supreme Court "address[ing] the constitutional rule against coercive jury instructions." *Id. Early*, the only other relevant Supreme Court case, does not expand further upon the principles from *Lowenfield*. 537 U.S. at 11. "About all that can be said is that coercive instructions are unconstitutional, coerciveness must be judged on the totality of the circumstances, and the facts of *Lowenfield* (polling a deadlocked jury and reading a slightly modified *Allen* charge) were not unconstitutionally coercive." *Wong*, 131 S. Ct. at 11 (Alito, J., dissenting from denial of certiorari) (citing 484 U.S. at 237-41).

Petitioner argues that his claim is governed by *Brasfield v. United States*, 272 U.S. 448 (1926). The Supreme Court in *Brasfield* held that a trial court's inquiry into the numerical division of a deadlocked jury results is *per se* reversible error. *United States v. Banks*, 982 F.3d 1103 (7th Cir. 2020) (citing 272 U.S. at 450). Petitioner's invocation of *Brasfield* must be rejected because it was decided via the Supreme Court's supervisory power over the lower federal courts, and is not a constitutional decision. *Lowenfield*, 484 U.S. at 239-40, n.3; *Lyell v. Renico*, 470 F.3d 1177, 1182 (6th Cir. 2006); *United States ex rel. Kirk v. Dir, Dep't of Corr., State of Ill.*, 672 F.2d 723, 727

(7th Cir. 1982). It is true that *Lowenfield*, which is the clearly established federal law governing this case under Section 2254(d)(1), discussed *Brasfield*, but it only did so within the context of rejecting the prisoner's "attempt to fit the instant facts within the holding of *Brasfield*. . . ." 484 U.S. at 230. The result is that *Brasfield's per se* reversal requirement is inapplicable because it is not clearly established federal law under Section 2254(d)(1). *Early*, 537 U.S. at 10; *Lowenfield*, 484 U.S. 240 n.3.[3]

Petitioner also argues that *Lowenfield* and *Early* do not govern because the juries in those cases did not provide a breakout of their votes for guilty and not guilty. The jury in *Lowenfield* was polled regarding whether further deliberation would be helpful in obtaining a verdict without inquiring in the jury breakdown as to the verdict. 484 U.S. at 234. In *Early*, the jury was polled regarding the breakout as to the verdict stating it was 11-1, but the jury was told not to inform the court as to which side the votes were on. 527 U.S. at 5. However, there is nothing in *Lowenfield* or *Early* to suggest that the totality of the circumstances test should not be applied in this case. *United States v. Williams*, 819 F.3d 1026, 1031 (7th Cir. 2016) (citing *Lowenfield*, 484 U.S. at 250; *United States v. Blitch*, 622 F.3d 658, 668 (7th Cir. 2010)) ("To evaluate

---

[3] Beyond the fact that the AEDPA bars the Court's consideration of *Brasfield* because it is not clearly established federal law, *Brasfield's per se* reversal rule would be inapplicable to this case even if Petitioner could overcome the AEDPA hurdle because the jury *sua sponte* informed the trial court of its numerical division. *United States v. Vanvliet*, 542 F.3d 259, 268 (1st Cir. 2008) (explaining that *Brasfield's per se* reversal rule applies when the trial court inquiries into the deadlocked jury's numerical division, but does not apply when, like in this case, the jury reveals its division to the court voluntarily); *United States v. Parsons*, 993 F.2d 38, 42 (4th Cir. 1993) (same).

potential coercion we look at the totality of the circumstances.")).    Therefore, the

totality of the circumstances test from *Lowenfield* and *Early* governs this case.

With these principles in mind, the Court turns to Petitioner's claim.   The state

court decision is not contrary to the clearly established federal law as it identified and

applied the controlling standard of evaluating whether the supplemental instruction

coerced the jury based upon the totality of the circumstances.   Dkt. 28-1, pgs. 10-13.

That the state court decision did not cite to, nor discussed, *Lowenfield* or *Early*, is

irrelevant as the state court need not cite to, nor even be aware of, the Supreme Court's

cases, "so long as neither the reasoning nor the result of the state-court decision

contradicts them."   *Early*, 537 U.S. at 8.

The state court ruling is also not an unreasonable application of the clearly

established federal law.   As mentioned above, the question of whether a supplemental

jury instruction is coercive is resolved by considering the totality of the circumstances.

*Lowenfield*, 484 U.S. at 241.   "A totality of the circumstances test gives courts

considerable room for judgment," *Dassey v. Dittmann*, 877 F.3d 297, 313 (7th Cir.

2017) (en banc), requiring deference under the AEDPA, *Yarborough v. Alvarado*, 541

U.S. 652, 664 (2004) (citations omitted) ("Applying a general standard to a specific

case can demand a substantial element of judgment. As a result, evaluating whether a

rule application was unreasonable requires considering the rule's specificity. The more

general the rule, the more leeway courts have in reaching outcomes in case-by-case

determinations.").

The jury instructions in this case are very close to the ones approved of in *Lowenfield*. *Compare*, 484 U.S. at 235, and Dkt. 28-1, pgs. 5-6. The instant instructions do not single out the jurors in the minority and reinforce the jurors' right to stick with their own views while encouraging them to reexamine their own positions through jury deliberation.

Jury coercion is a greater concern with a traditional *Allen* instruction, but an *Allen* instruction was not given in this case. *Allen v. United States*, upholds the use of "dynamite" supplemental jury instructions, "which encouraged the jurors to reconsider their individual positions and asked minority dissenters whether they 'might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.'" *United States v. Collins*, 223 F.3d 502, 508 (7th Cir. 2000) (quoting 164 U.S. 492, 501 (1896)). Although the use of an *Allen* charge is not without controversy, *Collins*, 223 F.3d at 508–09, *Lowenfield* reaffirmed the use of the "traditional" *Allen* charge, and in turn, the less invasive "modified" *Allen* charge approved of in *Lowenfield* is of even less concern on the question of jury coercion. 484 U.S. at 237-38.

The challenged instruction in this case comes from *Illinois v. Prim*, 53 Ill. 2d 62 (1972). The *Prim* instruction, which is codified as Illinois Criminal Pattern Jury Instruction 26.07, was adopted by the Supreme Court of Illinois as a rejection of *Allen*'s standard which urged the jurors in the minority to reevaluate their positions. *Illinois*

13

*v. Jones*, 2011 IL App (1st) 090675-U, ¶ 34. That the jury instruction in this case is similar to the approved instruction of *Lowenfield*, supports the reasonableness of the state court determination there was no jury coercion. *See Early*, 537 U.S. at 8 (noting that use of state court's standard jury instructions rejecting *Allen* charge and instead opting for a less coercive standard is evidence in support of conclusion that there was no jury coercion in that case).

The state's determination of no jury coercion is also supported by the passage of time during deliberations. *Lowenfield*, 484 U.S. at 240 ("We are mindful that the jury returned with its verdict soon after receiving the supplemental instruction, and that this suggests the possibility of coercion."). In the instant case, the jury provided its numerical breakout to the trial court at 6:30 p.m. after three hours of deliberating. The trial court's answer at that time was simply to instruct them to continue deliberating. The jury then asked for a transcript of Brown's testimony at 7:30 p.m., and then only received the challenged instruction at 9:00 p.m. after again stating they could not reach a verdict. The lapse of two and half hours between informing the trial court of their numerical division at 6:30 p.m. and the challenged instruction at 9:00 p.m. (along with the intervening event of asking for a transcript) lessens any concern regarding jury coercion. Beyond this point, the jury continued to deliberate for an additional three hours after receiving the challenged instruction and delivering its verdict at midnight. This three-hour period also supports the state court's conclusion that there was no jury

coercion. *United States v. Banks*, 982 F.3d 1098, 1105 (7th Cir. 2020); *United States v. Williams*, 819 F.3d 1026, 1034 (7th Cir. 2016). In sum, the state court's conclusion that there was no jury coercion in this case is not an unreasonable determination under the AEDPA's deferential standard. Accordingly, Claim One is denied.

## B.    Petitioner's Remaining Claims

Respondent argues that Petitioner's remaining claims are procedurally defaulted. To preserve a claim for federal habeas corpus review, a prisoner must fairly present the claim through one complete round of state court review, including through a PLA before the Supreme Court of Illinois. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845–46 (1999); *Weaver v. Nicholson*, 892 F.3d 878, 886 (7th Cir. 2018).

Petitioner, represented by private counsel, raised two claims before the state appellate court on direct appeal: (1) a challenge to the sufficiency of the evidence supporting his conviction; and (2) the trial court's supplemental jury instruction resulted in jury coercion. Dkt. 28-2, pg. 2. His direct appeal PLA before the Supreme Court of Illinois was limited to the jury coercion issue, and the sufficiency of the evidence claim was not raised. Dkt. 28-2, pg. 9. The result is that the jury coercion claim, which was raised in Claim One and resolved above, was the only properly preserved claim on direct appeal. The sufficiency of the evidence claim, that Petitioner now raises in Claim Five, is procedurally defaulted for failing to be raised in his direct PLA. *Boerckel*, 526 U.S. at 845–46.

Petitioner's postconviction proceedings did not properly exhaust any claims for federal habeas corpus review. His postconviction petition before the state trial court alleged ineffective assistance of trial and appellate counsel, prosecutorial misconduct for wrongfully withholding material information from the defense, and new evidence demonstrating his actual innocence. *Booker*, 2017 IL App (1st) 130177-U, ¶ 14. The trial court initially summarily dismissed the petition, but the state appellate court reversed and remanded for additional proceedings. *Id*. at ¶ 16. The state trial court again dismissed the ineffective assistance of counsel claims, but held an evidentiary hearing on the actual innocence claim. *Id*. at ¶¶ 17, 20. The state court again denied the postconviction petition following the evidentiary hearing, and Petitioner again appealed to the appellate court. *Id*. at ¶¶ 23–24.

Importantly, Petitioner only raised the actual innocence claim (along with a claim for DNA testing) in his appeal before the state appellate court. *Id*. at ¶ 2; Dkt. 28-4, pgs. 2-6. Petitioner's postconviction PLA only raised the actual innocence issue. Dkt. 28-5, pg. 52. Petitioner therefore only properly preserved an actual innocence claim in his postconviction proceedings, but he does not bring a freestanding actual innocence claim in this case.[4] As a result, Petitioner only properly preserved Claim One—the jury coercion claim—and his remaining claims in the instant habeas corpus

---

[4] Petitioner does argue that actual innocence excuses his procedural defaults, which the Court addresses below.

petition are procedurally defaulted.

The Court recognizes that Petitioner attempted to submit *pro se* supplemental briefs before the state appellate and supreme court in his postconviction proceedings. Dkt. 19, pgs. 26-33; 62-72. However, these requests were denied by the state courts because Petitioner was represented by counsel in those proceedings, and had no right to bring his own *pro se* supplemental filings. *Id*. at 43, 75; *see also United States ex rel. Harvey v. Lemke*, 2014 WL 2598843, at *3 (C.D. Ill. 2014) (noting that Illinois has a "well-established rule" barring hybrid representation). The state court's denial of Petitioner's attempt at hybrid representation results in an adequate and independent state ground of decision barring these filings from exhausting claims for habeas corpus review. *Clemons v. Pfister*, 845 F.3d 816, 820 (7th Cir. 2017). Respondent is correct that all of Petitioner's claims, except for the Claim One jury coercion issue, are procedurally defaulted.

Petitioner cannot excuse his defaults through either cause and prejudice, or a fundamental miscarriage of justice. Regarding cause and prejudice, cause is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or, (3) ineffective assistance of

counsel.  *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)).

Any failure by Petitioner's counsel to raise a claim either in the direct appeal PLA or postconviction proceedings does not excuse the default.  An ineffective assistance of counsel argument asserted to excuse a default must, itself, be properly preserved in the state courts.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009).  Petitioner has not exhausted any ineffective assistance of counsel argument to excuse the default of his claims.  Moreover, ineffective assistance of counsel in these settings are not grounds for excusing a procedural default.  *Davila v. Davis*, 137 S. Ct. 2058, 2062-63 (2017) (holding that ineffective assistance of postconviction appellate counsel does not excuse a default of claims); *Contreras v. Lashbrook*, 2018 WL 888754, at *3 (N.D. Ill. 2018) (noting that ineffective assistance of direct appeal PLA counsel does not excuse defaulted claims).

This leaves the fundamental miscarriage of justice (actual innocence) gateway to excuse Petitioner's defaults. To show actual innocence to defeat a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *McQuiggins v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).   This is a "demanding" and "seldom met" standard.  *McQuiggins*, 569 U.S. at 386 (citing

*House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial—such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")).

Petitioner claims that Kenneth Williams, who testified as an eyewitness against him at trial, is the actual killer. The state court conducted an evidentiary hearing on Petitioner's freestanding state law actual innocence claim where he testified on his own behalf. In his testimony, Petitioner placed himself in Wentworth Gardens very close to the crime scene on the evening of the shooting. Dkt. 28-8, pg. 16. He explains that he went to Melissa Westmoreland's Wentworth Gardens' apartment at 257 West 38th Place in Chicago, Illinois. *Id*. Petitioner concedes he is a drug dealer and used Westmoreland's apartment as a drug selling location. *Id*. at 15–16. He conducted drug sales with an individual at Westmoreland's apartment and then stayed after while Westmoreland braided his hair. *Id*. at 16. According to Petitioner, Williams was across the street from Westmoreland's apartment while Petitioner was in the apartment

19

selling drugs. *Id.* at 15-16. Per Petitioner, one of the men to whom he sold drugs in the apartment got into a verbal altercation with Williams after the man left Westmoreland's apartment. *Id.* at 16-17. Petitioner was not present for the altercation between his customer and Williams as Petitioner was still in Westmoreland's apartment at that time. *Id.* at 17.

Petitioner states he left Westmoreland's apartment and went to the apartment of his fiancé Caroline Wilson and their three children at 2931 South Federal in Chicago later that evening, but does not give an exact departure or arrival time. *Id.* Google Maps shows that Wilson's apartment is approximately 1.7 miles from Westmoreland's apartment.[5] Neither Westmoreland nor Wilson testified at the state evidentiary hearing, and neither provides an affidavit in support of Petitioner's actual innocence claim.

The record contains a portion of a police report summarizing an interview of Westmoreland taken by investigating detectives. Dkt. 19, pg. 73. According to the detectives' report, Petitioner, who Westmoreland identified as her boyfriend, arrived at her apartment on the evening of the murder at approximately 7 p.m. *Id.* He stayed until approximately 10 or 10:30 p.m. *Id.* Five other men came to her home with Petitioner and stayed the entire time while he was there. *Id.* She walked out with Petitioner and the men when they exited her apartment. *Id.* Westmoreland saw a

---

[5] http://tiny.cc/bwpwtz

group of approximately 20 people standing across from her apartment drinking and talking among themselves. *Id*. Westmoreland parted ways from Petitioner and the other men and walked to the rear of her home where she sat down. *Id*. While sitting, she heard several gunshots being fired at the front of her building. *Id*. She ran into her apartment to check on her children and then exited the front of her apartment to investigate. *Id*. She saw a man laying on the ground shot and heard people in the group saying that one of the men from the group that exited Westmoreland's apartment had shot the victim. *Id*. A handwritten statement by Westmoreland given to the police stated that Petitioner left her house approximately a half hour before she heard the gunshots. *Booker*, No. 2017 IL App (1st) 130177-U, ¶ 19.

Antione Ford and his then-fiancé Belinda Brown were Westmoreland's next-door neighbors at the time of the shooting. Dkt. 28-6, pg. 1. Ford provided an affidavit more than 12 years after the murder, and also testified at the state evidentiary hearing. Dkt. 28-6, pg. 1; *Booker*, No. 2017 IL App (1st) 130177-U, ¶ 20. His testimony at the evidentiary hearing and his affidavit are essentially the same. *Booker*, 2017 IL App (1st) 130177-U, ¶ 22.

Ford stated that he and his fiancé were very social with their neighbors including Westmoreland. Dkt. 28-6, pg. 1. Westmoreland had previously introduced them to Petitioner. *Id*. Ford also claimed to know Williams. *Id*. According to Ford, Williams was a "senior regent" in the Gangster Disciples street gang. *Id*. He

21

effectively "called the shots for the entire neighborhood." *Id*. Ford was previously a member of a different gang, Black Disciples, but alleges he stopped being a member of the gang in 2001 after he was shot. *Id*. at 2.

Ford claimed that he and his fiancé were sitting on the front steps of their apartment when Petitioner arrived at Westmoreland's apartment next door around 6:30 or 7:00 p.m. *Id*. Williams and a group of other men were sitting across the way for several hours that evening drinking and doing drugs. *Id*. at 3. At approximately 10 or 10:30 p.m., Petitioner and two other men left Westmoreland's apartment. *Id*. Petitioner got into his car and drove away according to Ford. *Id*.

Ford claims that the victim appeared on the scene 15-20 minutes after Petitioner left. *Id*. According to Ford, the victim was upset with Williams and the other Gangster Disciples in the group across the way. *Id*. at 3-4. The victim, who had been released from the penitentiary that day, was mad that the gang had not provided him financial support in prison, bond money, or paid for a lawyer during his criminal matter. *Id*. at 4. Ford stated that the victim told the group that he would start cooperating with the police in response to being abandoned by the gang. *Id*. This led to an argument between Williams and the victim, and then a fight. *Id*. Williams and the victim were initially separated, but eventually the men would speak again. *Id*. at 4-5. At this point, Ford and his fiancé had gone into the apartment out of concern that there might

be trouble. *Id.* Ford claims he was sitting in their apartment looking out the window when he witnessed Williams shoot the victim. *Id.*

Ford conceded that he initially told the investigating police officers on the night of the shooting that he did not see anything explaining he lied out of fear that speaking to the police would place him and his family in danger. *Booker*, 2017 IL App (1st) 130177-U, ¶ 19. Ford was imprisoned in 2004 for an unrelated 60-year murder and armed robbery sentence. Beyond fearing for his life, Ford explained that he initially did not come forward due to not knowing Petitioner's real name. *Id.* at ¶ 35.

The trial court at the conclusion of the evidentiary hearing rejected Ford's testimony finding he was not credible. *Id.* at ¶ 23. The court noted that Ford waited more than 12 years after the shooting, including more than a decade of which was in prison, before coming forward. *Id.* at ¶ 35. The trial court also found Ford less credible due to his status as a convicted felon. *Id.* at ¶ 36.

Petitioner's final witness at the state evidentiary hearing was Ellen Anderson. *Id.* at ¶ 15. Anderson provided an affidavit in which she stated that she witnessed Williams shoot the victim. *Id.* She also said that Williams followed her after the shooting and told her to "keep her mouth shut." *Id.*

Anderson, however, recanted her affidavit when testifying at the evidentiary hearing. *Id.* at ¶ 21. She explained that she and Petitioner had sporadically dated over a 10-year period and did not want to see him in prison. *Id.* She visited him about 10

times in prison and believed him to be innocent. *Id*. The trial court concluded her affidavit was "a lie, that she was not out there, that she did not see any shooting, that she had a relationship with Petitioner and she felt badly for him, she wanted to help him." *Id*. at ¶ 23.

Petitioner cannot demonstrate actual innocence based on the foregoing evidence. The reports involving Westmoreland do not help Petitioner. Westmoreland conceded to the police that she was not with Petitioner when she heard the gun shots, and that Petitioner had left her company shortly before the shooting in front of her home. Westmoreland is not an alibi witness nor an eyewitness. Petitioner does not account for his whereabouts at the time of the shooting and no one claims to be with Petitioner at the time of the shooting. Notably, Petitioner places himself very close to the shooting location at Westmoreland's apartment for much of the evening, and then says he traveled to another apartment less than two miles away.

The two witnesses who testified at the evidentiary hearing, Anderson and Ford, were rejected by the state trial court. A state court's credibility determination has a presumption of correctness, but the Court can reject that presumption when the state decision is objectively unreasonable. *Coleman v. Hardy*, 628 F.3d 314, 320 (7th Cir. 2010) (applying presumption of correctness to state court factual findings when federal court is considering actual innocence argument). The state trial court's credibility

determinations are reasonable and so are afforded the required presumption of correctness.

First, Anderson recanted her affidavit and testified that she was not present at the shooting. There is no reason to reject the state court's determination on this point.

Second, the state court was reasonable in rejecting Ford's testimony. As the state court correctly noted, more than 14 years passed between Ford allegedly witnessing the shooting and providing an affidavit in support of Petitioner. A delay in tendering new evidence undermines the credibility of the evidence. *McQuiggin*, 569 U.S. at 399–400. As the state trial court properly recognized, Ford's multiple year delay, especially once he was incarcerated and thus theoretically no longer in danger from retaliation, undermines his credibility. Equally, Petitioner made no apparent efforts to seek out Ford's testimony even though he allegedly would have known Ford was a likely witness having been friendly with him in the past and walking by him when going into and out of Westmoreland's neighboring apartment. Finally, the state trial court was correct to note that Ford's credibility was undermined by his prior felony conviction. Fed. R. Evid. 609(a).

In sum, the state trial court correctly dispatched Petitioner's proposed evidence. Applying the required presumption of correctness in this proceeding, Petitioner lacks the necessary evidence to demonstrate his actual innocence.[6]

---

[6] For argument sake, even if the state court's factual determination was unreasonable and not afforded the

One final point needs to be addressed. In addition to the evidence presented at the evidentiary hearing, Petitioner now raises new allegations of police misconduct that he believes supports his innocence claim. The first involves the Chicago Police Department's past use of "street files." Street files are investigative files compiled by police detectives containing exculpatory evidence. *Fields v. City of Chicago*, 981 F.3d 534, 542 (7th Cir. 2020). Street files are wrongfully withheld from the prosecution and defense attorney preventing the use of the exculpatory evidence at trial. *Id*. Petitioner argues that his case involves an improper street file, but the evidence he presents in the record does not support that conclusion. The only material he provides on this point is a single page letter from attorney H. Candace Gorman. Ms. Gorman explains that she represents a client in an unrelated case that involved a suppression of evidence in a street file. Dkt. 32, pg. 55. Although the letter is unclear, it appears that Ms. Gorman and Petitioner were in contact as part of her efforts to conduct a systemic review of Chicago Police Department street files in support of a *Monell v. Department of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), claim in an unrelated civil

---

presumption of correctness, Petitioner would still be unsuccessful with his actual innocence argument. Most charitably, Petitioner can muster two witnesses (Anderson and Ford) who claim they witnessed Williams shoot the victim. As mentioned above, these witnesses are discredited, but even if they were not, they would still not be enough to demonstrate actual innocence as the three eyewitnesses who testified against Petitioner at trial remain unimpeached. *Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010) (explaining that creating a battle of conflicting eyewitnesses does not demonstrate actual innocence); *Hayes*, 403 F.3d at 937 (same).

rights case brought by a different individual represented by Ms. Gorman. *Fields*, 981 F.3d at 542–43.

The Court sees no value to Petitioner from Ms. Gorman's letter. There is nothing in the record suggesting that there is a street file in Petitioner's case or that it contains exculpatory evidence demonstrating his innocence. Alleged misconduct by police officials in other cases does not, by itself, demonstrate the prisoner is innocent in his case. *McDowell*, 737 F.3d at 484. Petitioner provides no evidence to tie the alleged police misconduct Ms. Gorman was investigating to the instant matter.

Petitioner also points to further concerns of police misconduct. He claims that Chicago police detectives Chester Bach and David Evans worked on his case. He asserts these officers were part of disgraced detective Ronald Watts' corrupt group of officers who extorted drug dealers. *United States v. Watts*, No. 12 CR 87 (N.D. Ill.). He also notes that the officers worked a case of a different defendant, Norman McIntosh, who was later released from custody due to police wrongdoing. Petitioner argues that the officers framed him for the murder when he failed to provide them payoffs as they demanded.

Like the street file allegation, Petitioner fails to connect misconduct in other cases to his case. He provides no evidence demonstrating that the police officers framed him for this crime as he alleges. Moreover, it is notable that this proceeding, now almost two decades after the murder, is the first time Petitioner is making this

27

allegation of police misconduct. The lateness of the argument undermines its credibility. *McQuiggin*, 569 U.S. at 399–400.

In sum, Petitioner cannot demonstrate actual innocence to excuse his procedural default of his remaining claims. Accordingly, Claims Two through Seven are denied. The habeas corpus petition is therefore denied on the merits.

## III. Certificate of Appealability and Notice of Appeal Rights

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right; i.e., reasonable jurists would not debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2).

28

A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## IV. Conclusion

Petitioner's amended habeas corpus petition (Dkt. 19.) is denied on the merits. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondent Marcus Hardy, and replace him with Petitioner's current custodian, Christine Brannon-Dortch, Warden, Hill Correctional Center; (2) alter the case caption to *Booker v. Brannon-Dortch*; and, (3) enter a Rule 58 judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

Dated: 05/13/2021

Charles P. Kocoras
United States District Judge

29